UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
ANNA HUBBELL-PETANG,

                              Plaintiff,

            -against-

HOTEL RESERVATION SERVICE, INC., and       MEMORANDUM DECISION
ALEXANDRA BENAKIS, individually,             AND ORDER

                            Defendants.          20 Civ. 10988 (GBD)

------------------------------------x

GEORGE B. DANIELS, United States District Judge:

Plaintiff Anna Hubbell-Petang ("Hubbell-Petang") brings this action against Defendants Hotel Reservation Service, Inc. ("HRS") and Alexandra Benakis ("Benakis") (collectively, "Defendants"). She brings gender and pregnancy-based employment discrimination, harassment, and retaliation claims in violation of Title VII of the Civil Rights Act (1964), Americans with Disabilities Act (1990) ("ADA"), Families First Coronavirus Response Act (2020) ("FFCRA"), Fair Labor Standards Act (1938) ("FLSA"), and New York State Human Rights Law ("NYSHRL"); and state common law for intentional infliction of emotional distress ("IIED"). (First Amended Complaint ("FAC"), ECF No. 23, at ¶¶ 101-215.) Defendants move to transfer venue of this case to the Northern District of Texas pursuant to 28 U.S.C. § 1404(a). (Mot. to Transfer, ECF No. 19.) Defendants also move to dismiss Plaintiff's NYSHRL and IIED claims pursuant to Federal Rules of Civil Procedure 12(b)(6). (Mot. to Dismiss, ECF No. 24.) The motion to transfer is DENIED; the motion to dismiss counts 6-10 is GRANTED.

## I. FACTUAL BACKGROUND

### A. The Parties

Hubbell-Petang is an African American female who worked at HRS from May 3, 2019 to April 10, 2020. (FAC at ¶¶ 2-3.) HRS is an international company incorporated in Delaware that provides hotel reservation and accommodation services to "commercial and corporate clients." (FAC at ¶¶ 4, 6.) During the relevant period, HRS maintained its primary place of business in New York City with additional U.S. offices in Dallas, Texas and San Francisco, California.[1] (FAC at ¶ 3, 4.) HRS hired Hubbell-Petang as a Sourcing Consultant in HRS's Dallas, Texas office. (FAC at ¶¶ 3, 14.) Throughout her employment, Hubbell-Petang resided in Dallas and solely worked from the Dallas office or her home, except for one work trip to HRS's Germany office.[2] (Mem. of Law in Supp. of Mot. to Transfer, ECF No. 20, at 2.) Hubbell-Petang had two primary supervisors while at HRS: (1) her direct supervisor, Jean Tan Pierce ("Pierce")[3]; and (2) the Director of Sourcing Consultants, Defendant Benakis who was based in New York.[4] (FAC at ¶¶ 5, 22.) HRS Human Resources and the HR Manager, Veronica Toledo ("Toledo"), were based in New York. (FAC at ¶ 59-60.)

---

[1] At the November 18, 2021 hearing, defense counsel notified the Court that HRS closed its U.S. offices and that its employees now work virtually. (Nov. 18, 2021 Transcript "(Tr.")", ECF No. 41, at 17:13-19; Mem. of Law in Supp. of Mot. to Transfer, ECF No. 20, at 3; Declaration of Gerzo Moya, ECF No. 21, at ¶10.)

[2] At the November 18, 2021 oral argument, counsel for Plaintiff stated on the record that Plaintiff now resides in Cameroon. (Tr. at 27:2-13.)

[3] Neither party makes it clear which office Pierce worked out of during her employment.
[4] Jean Tan Pierce has since left HRS and now resides in California. (Dec. of Jean "Tan" Pierce, ECF No. 33, at ¶¶ 3, 5.)

### B. The Allegations

Unbeknownst to HRS, Hubbell-Petang was pregnant when HRS hired her. Hubbell-Petang informed Pierce of her pregnancy only after accepting her employment. (FAC at ¶ 22.) Pierce conveyed to Hubbell-Petang that HRS was displeased that Hubbell-Petang did not inform HRS about her pregnancy earlier and, purportedly, HRS sought to immediately rescind the offer. (*Id.* at 22-3.) Instead of rescinding the offer, Hubbell-Petang alleges a prolonged campaign of discrimination, harassment, and retaliation against her by the Defendants. (*See* FAC at ¶¶ 35-6, 101-215.)

The discrimination, harassment, and retaliation is segmented into two different time periods—pregnancy and post-pregnancy. According to Hubbell-Petang, while she was pregnant HRS subjected her to callous working conditions. HRS supposedly required her to travel to Germany during an at-risk pregnancy and during the trip HRS employees were disappointed with her having pregnancy related issues. (FAC at ¶¶ 30, 33, 35-36.) Once back in Texas, Hubbell-Petang alleges that HRS never accommodated her pregnancy, including requests to work from home and to take a longer maternity leave despite certain assurances by HRS when they hired her (before they knew she was pregnant) and later affirmations from Pierce. (FAC at ¶¶ 29, 37-43.)

Post-pregnancy and upon her retuning from maternity leave, Hubbell-Petang contends that she continued to face harassment and discrimination, specifically from Defendant Benakis. Hubbell-Petang describes a work environment in which Benakis submerged her with work, disparaged her effort and performance, and held her to unfair expectations. (FAC at ¶¶ 47-58.) HRS also supposedly interfered with Hubbell-Petang's ability to lactate while at work. She supposedly made repeated requests for reasonable accommodations that were unheeded or met with resistance, especially from HR in New York. (FAC at ¶¶ 59-65.) Notably, Hubbell-Petang

was allegedly told to pump in a restroom or closet as other female employees had done in the past. (FAC at ¶ 61.) When Hubbell-Petang contested these conditions, Toledo communicated with Emma Lenk, the Office Manager in Dallas, regarding Hubbell-Petang's requests. (FAC at ¶ 62.) She then was provided a transparent unlocked conference room in which employees could either see her or walk in.[5] (FAC at ¶ 62.) She states that these conditions caused her to limit how much she lactated at work causing her significant embarrassment and discomfort. (FAC at ¶ 63-4.)

Hubbell-Petang claims that she was the victim of adverse employment actions because of her accommodation requests and complaints about the harassment she faced from Benakis. She received unsubstantiated negative work reviews and was put on a performance improvement plan. (FAC at ¶ 67.) Then, shortly after requesting leave pursuant to FFRCA to address her parenting responsibilities, HRS terminated her on April 10, 2020. Defendants state they terminated her for reasons related to COVID-19; Hubbell-Petang alleges that she was terminated because of her leave request. (FAC at ¶¶ 85-9.) Hubbell-Petang made her request and learned of her termination while she was in Texas. (ECF No. 20 at 2.)

### C. Procedural History

On December 28, 2020, Hubbell-Petang brought this action alleging seven claims for violations of the Title VII, ADA, FFCRA, FLSA, and NYSHRL. (FAC at ¶¶ 101-99.) She also brings an IIED claim against the Defendants.[6] (FAC at ¶¶ 200-15.) On March 22, 2021, Defendants moved to transfer venue of this case to the Northern District of Texas pursuant to 28 U.S.C. § 1404(a). (ECF No. 19.) On April 23, 2021 Defendants moved to dismiss Plaintiff's New

---

[5] The complaint alleges there was an instance in which an employee did in fact walk in on her lactating. (FAC at ¶ 62.)

[6] The only claims filed against Defendant Benakis are the NYSHRL and IIED claims.

4

York State Human Rights Law ("NYSHRL") and intentional infliction of emotional distress claims pursuant to Federal Rules of Civil Procedure 12(b)(6). (ECF No. 24.)

## II.  LEGAL STANDARDS

### A. Transfer Under § 1404(a)

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). A court must engage in a two-factor inquiry when deciding a motion to transfer pursuant to § 1404(a). *See Dickerson v. Novartis Corp.*, 315 F.R.D. 18, 26–27 (S.D.N.Y. 2016). "First, the transferee district must be one where jurisdiction over the defendant could have been obtained at the time suit was brought, regardless of defendant's consent. Second, the transfer must be in the interest of justice and convenience of the parties and witnesses." *Id*. (citing *In re CenturyLink, Inc. Sec. Litig.*, No. 13–cv–3839 (LTS), 2014 WL 1089116, at *1 (S.D.N.Y. Mar. 18, 2014)).

The burden of proof rests with the movant, who must show by clear and convincing evidence that "the balance of convenience strongly favors the alternate forum[.]" *Xiu Feng Li v. Hock*, 371 F. App'x 171, 175 (2d Cir. 2010) (quoting *Ayers v. Arabian American Oil Co.*, 571 F. Supp. 707, 709 (S.D.N.Y. 1983)). The Second Circuit has identified nine factors to consider when determining whether there is such a balance:

> (1) the convenience of the witnesses; (2) the convenience of the parties; (3) the location of relevant documents and the relative ease of access to sources of proof; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded the plaintiff's choice of forum; and (9) trial efficiency and the interests of justice.

*DH Blair & Co. v. Gottdiener*, 462 F.3d 95, 106–107 (2d Cir. 2006) (citing Albert Fadem Trust v. Duke Energy Corp., 214 F. Supp. 2d 341, 343 (S.D.N.Y. 2002)).

"The factors do not comprise an exclusive list, and they should not be applied mechanically or formulaically but rather to guide the Court's exercise of discretion." *Matthews v. Cuomo*, No. 16-CV-4210 (NRB), 2017 WL 2266979, at *2 (S.D.N.Y. May 1, 2017). Still, "Plaintiff's choice of forum should not be disturbed unless Defendants make a clear and convincing showing that the balance of convenience favors defendants choice." *Hubbell Inc. v. Pass Seymour, Inc.*, 883 F. Supp. 955, 962 (S.D.N.Y. 1995); *see also, U.S. Commodity Futures Trading Comm'n v. Wilson*, 27 F. Supp. 3d 517, 537 (S.D.N.Y. 2014) (district courts should only exercise their discretion to transfer venue if the moving party "make[s] a strong showing that the balance of convenience and the interest of justice weigh heavily in favor of a transfer").

### B. Motion to dismiss under Federal Rules of Civil Procedure 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must demonstrate "more than a sheer possibility that a defendant has acted unlawfully;" stating a facially plausible claim requires the plaintiff to plead facts that enable the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). The factual allegations pled must therefore "be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted). A court makes this assessment by striking any conclusory allegations and then considers whether the plaintiff's remaining well-pleaded factual allegations, assumed to be true, "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. In deciding the 12(b)(6) motion, the court must also draw all reasonable inferences in favor of the non-moving party. *See N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 119–20 (2d Cir. 2013).

### III. DEFENDANT'S MOTION TO TRANSFER IS DENIED

This Court need only address the second part of the § 1404 test, because the Court finds that Defendants did not err in their analysis of whether the Northern District of Texas could have appropriately heard this action.[7] (ECF No. 20 at 5-6.) The remaining issue is whether Defendants clearly and convincingly demonstrated why a transfer to the Northern District of Texas is in the interest and convenience of the parties, witnesses, and justice. *See Hubbell Inc.*, 883 F. Supp. at 962. Defendants failed to provide such a reason and thus the motion is denied.

### A. Transfer to the Northern District of Texas is inappropriate.

While the Court must balance the nine factors listed by the Second Circuit in determining whether it should transfer this action to the Northern District of Texas, such a determination is at the discretion of the Court. *See Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 832 (S.D.N.Y., 2012); *see also Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 561 (S.D.N.Y. 2000) ("Weighing the balance is essentially an equitable task left to the Court's discretion."). There is no mechanical formula in balancing these factors. *Matthews*, 2017 WL 2266979 at *2. In fact, there may be instances in which not all factors are relevant or hold probative value.

Here, there are several factors that are moot or provide little weight. All documents are stored electronically thus rendering access relatively easy regardless of venue choice; therefore access to documents is given "little weight." *McGraw–Hill Companies Inc. v. Jones*, No. 12–cv–7085, 2014 WL 988607, at *9 (S.D.N.Y. Mar. 12, 2014). No party provided evidence to the Court

---

[7] Plaintiff only contests this issue by stating, "In the event the Court finds that the NDTX meets the venue requirements as set forth by law . . ." (ECF No. 31 at 4.)

7

1658, 2015 WL 1004299, at *3 (S.D.N.Y. Mar. 6, 2015) (quoting *Herbert Ltd. P'ship v. Elec. Arts Inc.*, 325 F.Supp.2d 282, 286 (S.D.N.Y. 2004). "When assessing the convenience of witnesses, a court does not merely tally the number of witnesses…[rather] the court must qualitatively evaluate the materiality of the testimony that the witnesses may provide." *Herbert v. Elec. Arts, Inc.*, 325 F. Supp. 2d 282, 286 (S.D.N.Y., 2004) (citing *DealTime.com Ltd. v. McNulty*, 123 F. Supp. 2d 750, 755 (S.D.N.Y. 2000)). For instance, in *Dickerson*, this factor weighed in favor of the Defendant because while Plaintiff listed more witnesses located within this venue, Plaintiff failed "to provide any description of the anticipated testimony. Thus, the Court [could not] discern if any of the witnesses would provide *material* testimony." *Dickerson*, 315 F.R.D. at 28.

Defendants' argument rests on the fact that HRS anticipates calling two material witnesses both located in Northern District of Texas. (ECF No. 20 at 7.) These two witnesses will purportedly provide testimony regarding "Hubbell-Petang's schedule and attendance, interactions with others in the office, steps taken to accommodate her lactation request, and her performance with respect to clients and account employees." (ECF No. 20 at 7.) Defendants contend that in contrast Hubbell-Petang's only witness in proximity to this Court is Benakis, who in fact resides in New Jersey. (*Id.*) On the other hand, Hubbell-Petang contends that Defendant's statements are woefully misguided. She does not deny the existence of the two Northern District of Texas witnesses, but contests the significance of any testimony they may provide. Also, in contrast to Defendants' position, Hubbell-Petang provides a list of eight witnesses located in this district that she believes will provide material testimony.

Defendants fail to convincingly demonstrate that the Northern District of Texas would be more convenient for witnesses. Unlike in *Dickerson*, the facts presented here provide little opportunity for the Court to qualitatively assess the materiality of the witnesses. Each party

provided nebulous and contentious reasoning regarding the significance of all the witnesses mentioned. For example, Plaintiff contends that in addition to Benakis,[10] another witness Veronica Toledo can provide material testimony regarding HRS' resistance to her request to lactate at work and Defendants failed to connivingly dispute Toledo's materiality. (ECF No. 31 at 8.) At oral argument, both parties provided "[the Court] different set of facts" regarding Toledo's relevant testimony. (Tr. at 36: 3-4.) This same conflict exists for the other witnesses Hubbell-Petang provides as well. (Tr. at 44: 21-25.)

Given the Courts lack of ability to currently determine the number of witnesses with anticipated material testimony, the Court finds that Defendants fail to clearly and compellingly show that this factor weighs in its favor.

### ii. *The Convenience of the Parties*

"A defendant moving for transfer must show both that the original forum is inconvenient for it and that the plaintiff would not be substantially inconvenienced by a transfer." *Tarzy v. Andrew Dwyer et al.*, 2019 U.S. Dist. LEXIS 3413, at *11 (S.D.N.Y. Jan. 8, 2019) (internal citations omitted).[11] Defendants clearly failed to make such a showing.

Defendants fail to demonstrate that this factor weighs in its favor. Defendants reasoning relies on the fact that employee witnesses and Hubbell-Petang reside in Texas.[12] Notwithstanding the discussion of witnesses above, Defendants' argument fails to address how NY is inconvenient

---

[10] This district would be more convenient for Benakis given that she resides in New Jersey, thus Defendants' arguments regarding Benakis hold no weight.

[11] Defendants articulate a slightly different standard under *Liberty Mut. Ins. Co. v. Fairbanks Co.*, 17 F. Supp. 3d 385, 399 (S.D.N.Y. 2014). However, in *Fairbanks*, there was a related action in the transferee venue, and so, the court was reviewing whether to set aside the "first-filed" rule. The factors considered for setting aside such a rule are "substantially identical" to the factors here. But this factual difference requires a slightly different analysis.

[12] This argument is weakened given that Hubbell-Petang now resides in Cameroon. (Tr. at 27:2-13.)

10

for them as they are required to show. In fact, one Defendant resides closer to this venue. Thus, Defendants again fail to make a clear and convincing case for venue transfer.

### iii. *The locus of the operative facts*

Defendants argue that "[t]he entirety of Plaintiff's claims is based on her employment (including her alleged lack of accommodation) and termination in Texas." (Reply Mem. in Supp. of Mot. to Transfer, ECF No. 34, at 9.) Defendant relies on *Dickerson* in which the court transferred venue to the Northern District of Texas despite New York being where the Defendant had its headquarters and was the origin of defamatory statements, because Texas was where the Plaintiff "was employed; where she complained of pay discrimination; where she was denied promotions and pay raises; where she was given negative performance evaluations; where she took medical leave; where she was investigated; and where she was ultimately terminated." *Dickerson*, 315 F.R.D. at 30. Plaintiff argues that *Dickerson* is inapplicable here because Defendants fail to offer facts or evidence clearly showing that Texas is the center of the operative facts, especially since her supervisor was located and HR decisions were made in New York. (ECF No. 31 at 15.)

Similar to *Dickerson*, the operative facts here did take place in Texas. Any accommodations that HRS did or did not provide; her learning about her termination; lactation issues; and her being forced to come into the office all occurred in Texas. *See Dickerson*, 315 F.R.D. at 30. However, Defendants have not met their burden of providing a compelling reason as to why this factor weighs heavily in their favor. The parties will presumably present evidence in this case by oral testimony or electronically stored document evidence (e.g., pictures of the conference room where Hubbell-Petang lactated or her performance evaluations). Thus, this factor does not hold the same weight as it may in other cases where the parties must physically roll troves

11

of evidence into the courthouse. Given that Defendants will be able to present the operative facts without being in Texas, this factor does not favor transfer.

        *iv.    The weight accorded the plaintiff's choice of forum*

Courts should be wary about altering the Plaintiff's choice of forum unless "the [moving party] carries [its] burden" of making a "clear and convincing" case that transfer is appropriate. *Dickerson*, 315 F.R.D. at 27 (quoting *New York Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 114 (2d Cir.2010)). "A plaintiff's choice of forum is entitled to significant consideration and will not be disturbed unless other factors weigh strongly in favor of transfer." *Hershman v. UnumProvident Corp.*, 658 F. Supp. 2d 598, 601 (S.D.N.Y. 2009). While it is true that this factor diminishes when "the forum selected is not plaintiff's home forum or the place where the operative facts of the action occurred," it does remain a significant factor "where the balance of factors" do not warrant a transfer." *McGraw–Hill Companies Inc. v. Jones*, No. 12-CV-7085 AJN, 2014 WL 988607, at *7 (S.D.N.Y Mar. 12, 2014) ("[T]his factor therefore tips in favor of retaining the action in this district, although not as heavily as it might if the forum bore a more substantial relationship to the facts underlying the litigation."); *TouchTunes Music Corp. v. Rowe Int'l Corp.*, 676 F. Supp. 2d 169, 173 (S.D.N.Y. 2009).

Defendants argue that Hubbell-Petang's choice of forum should be provided little weight because it is not where Plaintiff resides nor where the operative facts are located. (ECF No. 20 at 11.) Defendants are correct, but this factor still holds substantial weight given that the Defendants have failed to provide a compelling and clear reasoning as to why any of the other factors weigh in their favor, especially the convenience of the witnesses and parties. *See McGraw–Hill Companies Inc*, 2014 WL 988607 at *7. In fact, although the operative facts took place in Texas, that factor still did not clearly way in favor of the Defendant because of the relative means the

12

parties still had to provide evidence. Thus, despite Defendants' reasonable contentions, this factor still significantly weighs against a venue transfer.

In weighing all the factors set forth above, this Court exercises its discretion in determining that Defendants fail to have met their burden of demonstrating by clear and convincing evidence that transfer is appropriate. Therefore, Defendants' motion to transfer is DENIED.

## IV. THE MOTION TO DISMISS IS GRANTED

Defendants move to dismiss Plaintiff's NYSHRL and IIED claims pursuant to Federal Rules of Civil Procedure 12(b)(6), resulting in the dismissal of Defendant Benakis from this action. (Mot. to Dismiss, ECF No. 24.) For the reasons stated below, the motion to dismiss is GRANTED.

### A. Plaintiff's NYSHRL Claims are Dismissed

There is no dispute that "[i]n order for a nonresident to invoke the protections of the NYSHRL [], she must show that the discriminatory act had an impact within the boundaries of the State [of New York]." *E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 865 (S.D.N.Y. 2013) (citing *Hoffman v. Parade Publ'n*, 15 N.Y.3d 285, 933 N.E.2d 744). (Mem. of Law in Supp. of Mot. to Dismiss, ECF No. 25, at 4; Mem. of Law in Opp. to Mot. to Dismiss, ECF No. 30, at 2.) The impact test is meant to narrow the class of people afforded protections under the NYSHRL to "those who work in New York." *Hoffman*, 15 N.Y.3d at 291; *see also*, *Ware v. L-3 Vertex Aerospace*, LLC, No. 20-cv-875, 2020 WL 6494823, at *2 (2d Cir. Nov. 5, 2020) (examining "whether a nonresident alleging discriminatory conduct who did not work in New York can assert a cause of action under the NYCHRL or NYHRL," and finding that "every case to address this issue forecloses such a conclusion"). However, nonresidents may invoke NYSHRL protections "[w]here the discriminatory conduct occurs outside the geographical bounds of New York City…if the plaintiff alleges that the conduct has affected the terms and conditions of plaintiff's

employment within the city." *Anderson v. HotelsAB, LLC*, 15-cv-712 (LTS) (JLC), 2015 WL 5008771, at *2 (S.D.N.Y. Aug. 24, 2015) (plaintiff's failure to hire allegations stated a claim under NYHRL); *see also*, *Chau v. Donovan*, 357 F. Supp. 3d 276, 283-284 (S.D.N.Y. Jan. 7, 2019) (plaintiff's failure to hire allegations stated a claim under NYHRL).

Relevant to this inquiry, Hubbell-Petang's complaint simply alleges that her supervisor, Benakis, resided in New York so that some of the alleged illegal conduct, including the decision to terminate her, took place in New York. (*See* FAC at ¶¶ 47-58, 55-56, 85-89.) This is plainly a failure to state a claim under NYHRL by a nonresident.[13] *Hoffman*, 15 N.Y.3d at 289 (a termination decision made by employer executives in New York is not enough to state a claim under NYHRL).

Ostensibly realizing that her complaint was not enough, Hubbell-Petang now attempts to belie her complaint allegations through a declaration submitted by herself, (Dec. of Hubbell-Petang, ECF No. 32), suggesting that Defendants discriminatory and retaliatory acts impacted her in New York because it denied her "the opportunity to transition into a different position in New York City."[14] (Mem. of Law in Opp. to Def's. Mot to Dismiss, ECF No. 30, at 4.) She alleges that she had a conversation with Toledo about transitioning to NYC and subsequently emailed Toledo her resume. (Dec. of Hubbell-Petang at ¶¶ 11-19.) According to Hubbell-Petang, she was never able to formally apply because Benakis complained to Toledo about Hubbell-Petang, which resulted in "no longer any mention of [her] transitioning." (*Id.* at ¶¶ 20-22.)

---

[13] Defendants correctly highlight that Plaintiff failed to plead that she: "(1) worked physically in the State of New York; (2) traveled to New York related to her employment; or (3) was physically present in New York at any time during her employment." (ECF No. 25 at 3.)

[14] Defendants raise plausible arguments for why Plaintiff's Declaration is inappropriate. (Reply Mem. of Law in Supp. of Mot. to Dismiss, ECF No. 34, at 2.) However, Defendants' motion to dismiss is granted notwithstanding Plaintiff's potential impropriety, and thus, declines to rule on whether the Declaration should be disregarded.

Discrimination resulting in the failure to hire an individual to work in New York is a cognizable NYHRL claim by nonresidents. *See Chau,* 357 F. Supp. 3d 276 at 283-284; *Anderson,* 2015 WL 5008771, at *10-11. However, Defendants correctly argue that these cases are wholly inapposite to the facts presented to this Court. (Reply Mem. of Law in Supp. of Mot. to Dismiss, ECF No. 35, at 3.) In *Chau,* plaintiff alleged that she was not hired after discussing the details of her employment with the defendant, because she refused to submit to defendant's sexual harassment; in *Anderson,* the plaintiff claimed that she was not hired because she refused defendant's sexual advances after she applied and appeared for an interview. *See Chau,* 357 F. Supp. 3d 276 at 283-284; *Anderson,* 2015 WL 5008771, at *1, 3-4.

Here, Hubbell-Petang alleges that her current employer interfered with her potential ability to even apply for a transition to New York, but the interference is based on a complaint about her by Benakis and the cessation of any discussions regarding her transition. (Dec. of Hubbell-Petang at ¶¶ 20-22.) While the failure to hire in *Chau* and *Anderson* were contingent on alleged illegal conduct, Hubbell-Petang fails to demonstrate the same correlation. A complaint and the end of any conversations did not inhibit Hubbell-Petang's ability to formally apply. *Chau* and *Anderson* do not stand for, nor does any case law state, the notion that the requisite NY impact can be based on the mere possibility of applying for a transfer to New York within a company where Plaintiff already works. This Court declines to be the only court to do so.

Because Plaintiff's allegations clearly demonstrate that she did not feel the impact of discrimination, harassment, or retaliation in New York, each of her NYSHRL claims fail as a matter of law and are dismissed.

## B. Plaintiff's IIED Claim is Dismissed

Hubbell-Petang's IIED claims are analyzed under both Texas and New York.[15] The former can readily be dismissed as it is clear that Plaintiff fails to state a claim for relief. Under Texas law, "a plaintiff generally cannot sustain an IIED claim if the plaintiff could have brought a sexual harassment claim premised on the same facts" no matter if the IIED claim is against "an employer or individual employees." *Stelly v. Duriso*, 982 F.3d 403, 408 (5th Cir. 2020). Specifically, "the Texas Supreme Court has noted that IIED claims against both employers and individual employees premised on sexually harassing conduct can be foreclosed by alternative causes of action under Title VII." *Stelly*, 982 F.3d at 408. Hubbell-Petang's IIED claims specifically "re-alleges and incorporates each and every" claim asserted under alternative causes of relief, including Title VII. (FAC at ¶ 200.) Thus, she fails to state an IIED claim under Texas law.

A claim for IIED under New York law requires that the Plaintiff demonstrate: "(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." *Conboy v. AT&T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001). For an IIED claim to stand, the conduct alleged must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Wahlstrom v. Metro-North Commuter R.R. Co.*, 89 F. Supp. 2d 506, 529 (S.D.N.Y. 2000) (internal quotation marks and citation omitted). Pleading the requirements of an IIED claim is "difficult to satisfy." *Cruz v. HSBC Bank USA, N.A.*, 586 F. App'x 723, 725 (2d Cir. 2014). A Plaintiff can only withstand a motion to dismiss by pleading facts that show "the conduct has been so outrageous in character, and so extreme in degree, as to

---

[15] This court decides to analyze the IIED claims under both laws in an effort to not address any potential conflict of law issues that may exist, given that Plaintiff fails to raise any in her papers.

16

go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* "The "rare instances" when courts in this circuit have recognized IIED claims "in the employment context" are when "the claims have alleged not merely sexual harassment, but "more significantly, battery." *Wahlstrom*, 89 F. Supp. 2d at 529 (quoting *Gerzog v. London Fog Corp.*, 907 F.Supp. 590, 604 (E.D.N.Y.1995)).

Hubbell-Petang's allegations fail to rise to the level of extreme and outrageous conduct necessary to plead a New York IIED claim. Plaintiff's claims about the lack of accommodations related to her lactation and pregnancy needs, unfair work demands and scrutiny of her work, and termination are commonplace discrimination that do not give rise to an IIED claim. Plaintiff argues that courts should no longer stand for the public humiliation of mothers in the workplace, such as having to lactate in front of coworkers or exacerbation of her burdens as a pregnant woman. (ECF No. 30 at 5-7.) That is a legitimate argument, but there are laws to protect against this type of harassment and discrimination; laws under which Hubbell-Petang already asserts protection. An IIED claim requires pleading conduct that is "so extreme in degree," such as battery or repeated unwanted sexual advances. *See Collins v. Willcox Inc.*, 600 N.Y.S.2d 884, 885 (Sup. Ct. 1992). Hubbell-Petang fails to meet this high bar; therefore, her IIED claim against the Defendants must be dismissed without prejudice.

## V. CONCLUSION

Defendant's motion to transfer, (ECF No. 19), is DENIED. Defendant's motion to dismiss counts 6-10, (ECF NO. 24), is GRANTED. The Clerk of Court is directed to close the motions accordingly.

Dated: New York, New York
      March 01, 2022

SO ORDERED.

*George B. Daniels*

GEORGE B. DANIELS
United States District Judge